Case number 20-7040 Broidy Capital Management LLC and Elliot Broidy versus Nicolas de Muzin et al, a balance. Mr. Obermeyer for the balance, Mr. Coffin for the appellees. Good morning, counsel. Mr. Obermeyer, you may proceed when you're ready. Morning, your honor. Thank you and may it please the court. My name is Steve Obermeyer and I represent appellants Nicolas Muzin and Stonington Strategies LLC. I'm also arguing today on behalf of appellants Joseph Allahan and Gregory Howard. This case challenges the legality of diplomatic decisions made by the foreign sovereign state of Qatar. The Ninth Circuit has now held that Qatar is entitled to immunity for the exact same wrongful conduct that is alleged in this case. But Mr. Obermeyer, Qatar is not a party here and there's no evidence that the defendants in this case were employed by Qatar or that Qatar chose them as agents here. In fact, I'm not even sure why you have a right to appeal given those facts. Can you at first address our appellate jurisdiction? Yes, I do have to, your honor. First of all, what's been alleged is that appellants are agents of Qatar acting at the direction of Qatar. The whole theory of Mr. Brody's case is that Qatar decided to do not to target Mr. Brody, but to do a hacking and dissemination scheme, which he directed appellants to do. Those are the allegations in the complaint. The absence of evidence at this point, I don't think is an issue because that's what Mr. Brody says happened. He pled himself into that. In subject matter jurisdiction, we don't always just go on the pleadings. The record suggests the lack of even a formal agency relationship between defendants and Qatar. The contract that was in the record said that the embassy doesn't acknowledge these people as their agents. The contract in the record, your honor, says that the appellants were hired to do various lobbying and diplomatic work on behalf of Qatar. And then Mr. Brody goes farther and alleges that appellants were directed to conspire to hack and then distribute materials from the hack in order to advance its political agenda against Mr. Brody. I'm reading from Mr. Muzzin's opening brief on the motion to dismiss, which the other briefs incorporated by reference on page 23, note 11. He says, the Qatari embassy states that does not establish an agency relationship between Qatar and Stonington. And it states to an exhibit in the California litigation. That's correct, your honor. That's what the contract says. But what's alleged in the case is that the relationship started off doing lobbying and turned into, I don't know the worst, when Qatar directed appellants to participate in a hacking conspiracy. Well, you're going to help us out. The complaint alleges you're going to help us out in all these various ways. But it also says, and you're not our agent, by the way. Well, your honor, the contract said that, but the complaint alleges that they are Qatari agents. And I would point you to actually Mr. Brody's own words in his opposition to the interlocutory appeal motion on page eight. He says that appellants were plainly agents for Qatar. And he also says that he alleges that defendants acted at Qatar's direction. He also says in his opposition brief here that Qatar and appellants sought to isolate and marginalize Brody's influence through a tried and true Qatari tactic in illegal hacking and media distribution. So that's Brody's own characterization of his complaint. I understand that you're relying on the characterizations in the complaint, but there's something peculiar about basing our jurisdiction on those allegations when we have reason to believe, when we don't have any reason to believe that Qatar has actually sought to assert its immunity for your clients. Well, I guess a few things, your honor. On the jurisdictional point, this court has been clear that foreign sovereign immunity is a collateral order doctrine issue. Conduct based immunity that is what we're dealing with here is immunity of the foreign sovereign. So what case do you have where there's interlocutory appellate jurisdiction, and there's no foreign state, or in the case of Samantar, putative voice on behalf of a putative sovereign involved in any way? I'm not sure about the absence of the sovereign in any way, but the cases I'm thinking of are Farhang, I believe it's the Malani or Matani decision in the 11th circuit, Farhang is... Mamani? Mamani, right. Farhang is... I'm sorry, Farhang is in the 9th circuit, and then also Samantar. The cases you cited, I thought, were PNID versus Nigeria and Kilburn versus Libya from this court. Those cases both involve sovereigns, claims against sovereigns. Yes, your honor, specifically this court, we cite Kilburn, we cite PNID, but those cases, like I said, say that foreign sovereign immunity satisfies the standard for collateral order doctrine, and conduct based foreign sovereign immunity is the immunity of the foreign sovereign. So it's our position that that's covered, and the cases I was referring you to from other circuits are cases that have held that conduct based immunity is immediately appealable under the collateral order doctrine. Minister Obermeyer, on this point, you have some burden when it comes to the jurisdiction question here, and some burden when it comes to your assertion of immunity. Put aside the complaint and put aside the contract. Do you represent that Muzin was an agent of Qatar? I don't know that I can represent anything beyond what's been alleged at this point, your honor. So you can't represent that Stonington is an agent of Qatar? They were acting as contractors for Qatar, sure. That's not my question. Right, they registered under FARA as agents of Qatar, yes. So are you representing that they are agents of Qatar? Yeah, they registered under FARA, they are agents of Qatar. And you have not requested an opportunity, if we were to look beyond the pleadings, an opportunity to establish the direction by Qatar in the district court. You never asked for that in the district court? Your honor, no, because again, Mr. Brody, his burden to start was to plead an objection to the state's immunity. He pled that the objection comes down to the fact that the agents here are US citizens. At that point, we're operating under the complaint. And Mr. Brody's never really pushed back on that, your honor. I believe there was a request for 12 v. 1 discovery, maybe in a footnote at the motion to dismiss stage. But going back to those quotes I read you from his own briefing, he has agreed with us that that is what he's pleading. And that's what- Our jurisdiction is not something that the two of you can agree on. If there's any waiver here, the waiver is by Qatar, which I mean, why shouldn't we just hold that the immunity emanates in one way or another from it never has asserted anything in this case? Well, your honor, this is something that we need to get to that we've gotten sidetracked a little bit. But what the Supreme Court said in Samantar is that in the absence of a statement of immunity like the case here, it's not that the inquiry ends there. It's on the court to look to the established principles of the State Department and the common law to understand the agent's immunity. And that's what we're asking the court to do here. I mean, keep in mind when the case was initially decided in California a couple of years ago, the court found right away that Qatar was immune. You have the allegations in his own complaint that we're the agents of Qatar. So at that point, from a 12 v. 1 perspective, there's no more to do. I mean, the pleading standard for him at that point is similar to a 12 v. 6 standard. There's been no request for discovery, no further factual development. And that's the record. That's why your jurisdiction, I don't think, is affected by the fact that we're on the complaint. But Qatar never communicated with the State Department to request a finding of immunity for these defendants, correct? That's correct, Your Honor. But my response to that would be they had the ruling right away that they were immune. They had the allegations that we're acting at their direction. And if you look at the Heaney case from the Second Circuit, from Judge Friendly, he says in the absence of a statement of immunity, when you're talking about the heart of political acts, diplomatic acts like you have here, the court doesn't need a statement of immunity to find jurisdiction. What diplomatic acts are you talking about? The ones that the Ninth Circuit said here, the hacking and distribution of hacked materials, the Ninth Circuit said are diplomatic activities of a sovereign. That the use of irregular operatives to hack an enemy and distribute those materials are, quote, uniquely sovereign. To the extent they're engaged in by Qatar. But these laws, these statutes and the California law that was alleged are, they all apply also to private individuals who want to go in and hack. And for example, if your clients had done what they did and then turned around and offered their wares to Qatar, there would be no claim of immunity. I think that's right, Your Honor, but that's not what happened here. I mean, there's no daylight between what the Ninth Circuit held Qatar is immune from doing and what Mr. Brody alleges we did. The state can only act through its agents. I mean, that's a sort of a fundamental proposition of foreign sovereign immunity that goes back 200 years. State can only act through its agents. The agents here, as alleged by Mr. Brody, are appellants. And so what he's challenging, what a litigation of this case would be, would be a judgment on how Qatar, A, decided to implement its diplomatic acts, as the Ninth Circuit said. And also, it would be an adjudication of Qatar's decision to use US agents to do that. How would exercising jurisdiction here, how does the district court's order that it wants exercise jurisdiction here, have the effect of enforcing a rule of law against the state of Qatar? I don't see that. If the district court is careful about discovery and respecting Qatar's immunity, it can apply the domestic law to these individuals without any attention to the role of the state. Well, two things, Your Honor. Respectfully, that standard is from the Restatement which we contend is not the scope of conduct-based immunity in the common law. So when Lewis is talking about that, for instance, that's under the assumption that section 66 is the scope of conduct-based immune common law. So that's not what we're saying. So I want to be clear about that. But in this case, it's still even different than Lewis if you apply that, because in this case, the agents are doing what Qatar has been held to be immune to do. I said that correctly. But the actions that the agents are taking, they are the state when they're doing them, when they're directed by the state. And so this is where it's not about the individuals. That's what conduct-based immunity is about, the immunity of the state. And again, that's a criminal premise. If you take the allegations as true of the complaint, would you agree with me they make out a criminal offense under federal law? Honestly, I'm not a criminal lawyer, but it sounds criminal to me. Yeah. And isn't it also true that an individual committing criminal offenses is not entitled to immunity? Well, that's true, Your Honor. And in fact- And then doesn't it follow then that if we accept the allegations in the complaint, as you have just agreed, making out a criminal offenses, there's no way that these individuals are entitled to immunity? Because if they were, then I think there's some indictments that have to be dismissed of some Russian hackers that occurred during the previous election, not this one. Well, I think it's two- I'm not sure I'm trying to find, Your Honor, but I think it's two separate things. I mean, what we're saying here is that they are immune for the civil claims in this case. And what's left are misappropriation of trade secrets, receipt of stolen property, and conspiracy for basically hacking. We're not saying there's immunity from criminal. And in fact, as we said in our briefs, I mean, the executive retains the authority in these cases to basically decide they're not going to recognize immunity here and pursue them criminally. Why does it make sense if the same action would make out a criminal offense? If they were indicted first and convicted, and then a case was brought, a civil case was brought, there's no possible way they could have immunity. Well, I'm not sure, Your Honor, why it makes sense, though, is because you're in the province of the executive here, at least in terms of understanding foreign sovereign immunity. And so when the executive decides we're going to prosecute this case, they're making a judgment on foreign sovereign immunity. What you have here is you have another U.S. citizen, you know, arguably with an agenda of his own, bringing a civil claim against other U.S. citizens, and that civil liability where the foreign sovereign is at the mercy of an individual bringing a case at the mercy of the courts, that's what is sort of at the heart of foreign sovereign immunity, at least put aside the jurisdictional question, appellate jurisdiction. Is it your position that every individual or company, I guess, for that matter, that is registered under the Foreign Agents Registration Act has immunity for anything that it does in compliance with the wishes of the particular government that they're representing? No, absolutely not, Your Honor. I mean, what I'm saying is something narrow. What I'm saying is that you said that because two of your clients at least registered under FARA, that that shows that they're agents of Qatar, and anything they do that Qatar asks them to do comes within the sphere of immunity. But let me be clear, Your Honor. So I was asked a question by Judge Walker about outside of the complaint, are they agents? Having registered under FARA, they are agents of the foreign sovereign. Their FARA registration is not what we're saying is the scope of the agency for what happened in this case. What we're saying is the narrow point that because they were pled to have done what Qatar directed them, so it's not an issue of discretion. It's what they were directed to do. Those are the same acts that Qatar has been held to be immune, for which Qatar has held to be immune. It has to be that the people, because the foreign sovereign acts through individuals, it has to be that they are immune too. There's no daylight between them and the individuals. And that's not a broad- I don't follow that. So imagine you have, I mean, I understand the core cases, all the cases with, you can point out the exceptions to me, but most of these cases involve employees or officials of the state. And when we talk about a foreign official sovereign, we're talking about people who have a relationship as the arm of the government that's immune. It's a very different situation where you have somebody that's hired to sketch out a plan and maybe take action. And where as appears, there's a disclaimer of an agency relationship in the contract. And to say that Qatar would be immune to the extent, assuming for purposes of the jurisdictional question that Qatar would be immune for its action, if it did this, it's very different to say that individuals whose relationship to Qatar has only been pleaded and not established are entitled based on that pleading to immunity. I don't know of any case that goes nearly that far. Well, your honor, I think you've got five cases where it starts with butters and I can go through them all right. Where the fact that they're contractors, what was key was that they were directed to do what they did, not their status. And I think the issue is that this is not status based immunity. This is conduct based immunity. And if you look at the common law, if you look at what the state department has said, if you look at the foreign sources that the state department incorporates, it's clear that the fact that you're not an official in the sense that you're working under some sort of a status with a foreign government is not where you draw the line here. Agents of the foreign sovereign, those working at their direction are entitled to that derivative immunity. It's conduct based immunity as opposed to status. That's why I think thinking about them in terms of those cases involved officials, that's not conduct based. Your best case, your best case is butters? I think butters is our best case. Yeah. And Mariah and also Ivy, Rishikoff, Alecog. But fundamentally, it's butters. And I think Mariah is very helpful too. And to be clear about Mariah, I mean, the individual in that case, he was a former Israeli minister or something of some sort, official of some sort. But in that case, he was acting at the point when he was a U.S. resident barred in New York, I think a head of a New York hedge fund. And there was being in that case, well, and Mariah cited butters favorably. And then in the Ben-Haim Statement of Interest, Department of Justice cited Mariah favorably. So I think the principles and butters are clear going back to the case of Sinclair up through recently Mouton in the Justice Department cited the case of Sinclair and Mouton just a few months ago. And would you welcome an opportunity to establish as a factual matter in an evidentiary hearing on remand your client's role in regard to the conduct alleged here acting as agents of Qatar? Well, I'm not sure. I mean, my concern is this case has been this is, I think, the sixth complaint filed by Mr. Brody. I mean, this is this is what he's pleading. These are these arguments were raised in California. He hasn't at any point said that we went rogue, that we were doing something outside of Qatar's direction. What he says is we acted in his direction. And I think it goes to his whole theory doesn't make any sense if we're not acting in Qatar's direction. So I don't know what discovery would would would would do at this point. I mean, I think this is this record is enough for your jurisdiction. Is the cutters involvement is not I mean, he's not going to in the end have to prove cutters involvement. Right. I mean, there are violations here that have to do with hacking, getting into accounts that you're not supposed to have access to doing so repeatedly. I mean, none of the law that supports the causes of action in this case require any involvement of any foreign government. Right. But his theory, Your Honor, I understand his. Yeah. I mean, he may not get to do the discovery that he hopes to get about Qatar. I mean, people's motivation for suing is separate from what the law requires and what the claim rests on. You don't have any question that this case could proceed if Qatar tomorrow turned out to have been a fiction that never existed, could it? I mean, maybe Mr. Brody wouldn't want to bring the case, but you could litigate this entire case if there's no such thing as Qatar in the world. Right. Only if everything about the case as it's been pled six times up until now is totally different. No, no. I'm talking about the factual elements that are that are alleged, supporting the claims of violation of the law. I suppose, Your Honor, as a discrete point, but then the whole thing becomes different. It becomes, you know, you have individuals who are doing something on their own to hurt Mr. Brody and the entire context of the case. Everything about this, it's an entirely different case. The case that you have before you, and this was Mr. Brody's to plead it this way and to not ask for, you know, 12B1 discovery is that we were acting in Qatar's direction. So that's the record. I'm not sure if that affects your jurisdiction or affects the ability to make a decision here. And again, it's not like this is the first time Mr. Brody's been here, meaning in court with these allegations. He's never, never at any point said anyone went rogue. In fact, Your Honor, the complaint is one more point. You know, he says after the initial hack, he went to Qatar and said to Qatar, and I could advocate the quote here for you, but can you direct defendants to stop or are they rogue or are there rogue agents? I mean, again, fundamentally what this is about is, is that appellants were acting at Qatar's direction. And I assume on, if this is remanded to the district court, that you will be objecting to any and all discovery into the involvement of Qatar. Well, we didn't really talk about discovery yet, Your Honor, but I mean, I, you know, I know what's happened so far and what's going to happen in the district court, which is Mr. Brody will seek invasive discovery about what happened in California. The way that manifested itself was that there was sort of an agreement to stay away from the parties, but at the time, for instance, Mr. Allaham was not a party. Discovery was taken. Qatar was in that case, of course, but they stepped in to protect under a protective order as highly confidential, what the California court later referred to as the diplomatic communications of Qatar. And this was just, you know, one sort of discrete thing. They stepped in to claim immunity or not immunity, I'm sorry, diplomatic privilege over phone records, over other things as well. What's going to happen here is if the case goes forward, Your Honor, I think we said this, it's going to be a document by document, witness by witness, scorched earth, you know, sort of battle over what's Qatar's, what can it protect? And, and, and the reason that is, I think, I sort of fundamentally goes back to what I've been saying the whole time is because it's the case is about Qatar. You never sought to have the case dismissed for failure to join an indispensable party that could not be joined under Rule 19. We didn't in this case, Your Honor, it was kind of requested it in kind of requested it in California. And it was denied. And, and we were, we were relying on the immunity decision here, Your Honor. And if you look at all these cases, I don't see many Rule 19. arguments. I mean, you know, Roman obviously brings in a few other factors. But you know, fundamentally, you know, also the California court had ruled against that. Because Qatar was in the was in the California case. So they didn't need to dismiss. No, no, it was it was because even if they were immune, they may be necessary, but they weren't indispensable. Can I ask a question about a statement you made in the district court that I think does not mean that you've waived the argument you've making, but I want to get some clarification on it. You said, and this is a docket entry 41 page 12. Defendants here assert derivative sovereign immunity, not foreign official immunity. One way to read that is that you're kind of derivative immunity, the butters talked about, but you're not a certain conduct based foreign official immunity, like the kind that was an issue in Lewis. Is that what you were saying, then? I think that was in a footnote, right, Your Honor, I don't have it in front of me. And, and, you know, I can't remember precisely what we were getting at, then other than Lewis had come out kind of in the middle of things and sort of shaken things up. And we were sort of figuring out where we were. But But, you know, I would say we have not waived it. The point was merely we were trying to say, you know, we were bringing a derivative sovereign immunity case at that point. You know, and we've since reacted to Lewis, but I we have not waived it. Can you just kind of give me a reason why a statement defendants here are not asserting foreign official immunity is not a waiver of your argument that you are now asserting foreign official immunity? Two things, Your Honor, it was in a footnote. And as opposed to the text, and also in the reply, we were very clear that we were doing under we were we were starting under both. Okay. Is that because footnotes don't count? Well, I you know, I guess it depends on the footnote, Your Honor, but you know, Justice, Justice Douglas in the dissent said that he said footnotes don't count complaining about the majority opinion, but he said it in a footnote. The reason I'm hesitant is because I tend to use them as well. So I don't want to, you know, waiver about that down the road, either. But isn't it also an issue for in terms of waiver that the district court did go ahead and address foreign official immunity as well as derivative immunity. So in some sense, those issues are both before us. Thank you. That's also a very good point. And it was it was before us. It was before you on for that reason as well. All right. No further questions. Not for me. All right. Thank you, Mr. Omar. We'll give you a couple of minutes on rebuttal, even though we've way exceeded the time. Thank you. We'll hear now from Mr. Coffin. Thank you, Your Honor. May I please order? You can hear me? Okay. We have a little muffled. But yes, we can. If I can stand closer to this. Okay. Defendants are U.S. citizens and residents who claim two different forms of what they call foreign sovereign immunity for their involvement in this hack and smear scheme against another American on U.S. soil. Now, Judge Pillard, I want to just briefly on jurisdiction. Our argument on jurisdiction is that there is not a substantial public interest in these defendants being heard in this court at this point. And the reason is their entire argument is that there is a substantial interest in protecting Qatar. Qatar is not here. Qatar has not not sought relief from the United States. And Qatar has done everything they can to disclaim association with with the facts of this case. So it's very hard for me to see how there is a substantial public interest in protecting Qatar in this case, when Qatar has done nothing to protect itself on the merits. But I mean, the collateral order doctrine doesn't look at substantial public interest. It just looks at whether there's an issue that's conclusively determined by the district court that is completely separate from the merits and would be effectively unreviewable on appeal. And yes, it has to be an important issue completely separate from the merits. But but we typically, when we're looking at jurisdiction, we assume the party could prevail on its position and determine in that posture. And so if we assume that Mr. Obermeyer prevails on the jury, what, why, why doesn't that just resolve the jurisdictional question? Well, first, substantial public interest is, with all respect, part of the void, the right, they want the right to avoid a trial, but it's the right to avoid a trial that would imperil substantial public interest. And the reason is that these defendants, these alleged agents of Qatar, private agents of Qatar, there's no substantial public interest in in the timing of this appeal, they can bring that issue at the end of the case. And, and, and they can be protected, if they are correct, they could be protected from liability at that point. But the right to avoid a trial, as opposed to the right to avoid a trial doesn't imperil substantial public interest, as to these defendants, unlike the state itself where they're made. I'm still having trouble following how you're using that. I mean, I understand that the explanation about imperiling a substantial public interest is a very, it's a big basket describing why we have interlocutory appeals in cases involving, say, immunity, and the protection of immunity, a very general level, that is the substantial public interest. We don't look and say, well, what about this case? Or this case? Is this, is there? Well, it's the kind of immunity, it's the kind of immunity, Your Honor, it's the immunity. And yeah, there's, there's a bit of a merit here. But the, the, the immunity as to non-public agents of a foreign sovereign, I mean, part of this is simply, these guys just don't, don't merit immunity. And it bleeds into the merits, in some regard. And of course, we try to avoid the time of the appeal. So in some sense, we are here on the merits. And I'm happy to talk about the merits. I don't want to get too dragged down in jurisdiction, because I think the merits are incredibly strong for our side. And, and, you know, I'd like to move to them. But that's, that's, I hope, I hope I got my position. I mean, that makes more sense to me. There is always some sort of merits consideration. If somebody, you know, if I'm sued by my neighbor, because my tree is overshadowing hers, I can't just say, well, like, Italy made me do it, and now I'm going to appeal. So, so there, you know, you're always looking at some level at the type of merits claim. And that, to me, that makes more sense than looking more specifically at public interest with respect to, you know, the facts. Yeah, that's helpful. So, look, on the merits, Your Honor, this, this, and I think the parties agree that Samantar and Hoffman, and even going back to Schooner Exchange, the inquiry on the merits is this, is this two whether Qatar, the foreign state has asked for immunity, they have not, nor have they, as Mr. Obermeier said, nor have they gone to the State Department in any way to seek the United States intervention here. As a matter of fact, Judge Pillard, in the Ninth Circuit, or in the Central District of California, the Qatar actually opposed going to the State Department. They said this is judicial issue. And, and you don't have to go to the State Department. We early on, we had said, let's ask. And both both defendants said, no, you don't have to ask. And you can dismiss that case on other grounds. But so, so that the lack of Qatari involvement in this case does frame this case. Now, Mr. Coffin, I mean, it would be helpful to have you address directly the core of Mr. Obermeier's contention, which is, this is a 12b1, it's a motion to dismiss, it's based on the complaint, the allegations of the complaint again, and again, talk about the defendants acting at the behest of Qatar. Why don't we take that, take your word for it, on this point, in terms of analyzing the immunity? So the State Department doesn't take it on, take just the allegations of the complaint. And this court has never just looked at the allegations of the complaint. But that said, I want to talk about the allegations of the complaint a little bit. Tell me what your best authorities are when you say the State Department and this court don't just look at the allegations of the complaint. Well, so this court in, I'm going to quote Judge Sentel, which is my favorite thing to do being a former Judge Sentel clerk. Bell House versus Yellen. Bell House involved allegations of some official act. This was under the FSIA. And Judge Sentel said, we still want to look at the facts. We have an obligation to satisfy ourselves with the facts. And so they looked at the question of official action in that case, notwithstanding the allegations of the complaint. And the state has said, look, even when the foreign sovereign tells us something is in an official capacity, we're still going to satisfy ourselves of that. And they've said that, Judge, I mean, there are a number of briefs that we filed. We have a supplemental addendum in this case. Yes. We thought that would be helpful to you here, given that they're not always easy to find. And in those, in that addendum, I mean, state repeatedly says it's our, it's our determination, you know, with the input of the foreign state that matters. As to the allegations of the complaint, we certainly say they are the agents of the foreign sovereign, because they're registered under FARA. The question is, did this occur in any official capacity? And I want to back up for a factual question, because agent, the question of, is there an established policy of the United States recognizing immunity under the circumstances here? Step two of the Salmon Tar analysis. There is not a single authority that deals with a pure contracting agent. The best case for Obermeier is Henry Sinclair, the 1797 Attorney General opinion, but that's under a commission that is a commissioned privateer under a formal commission recognized under international law to give the protection of the state to the commissioned ship and captain who can't be when there is no authority for pure contracting agents. The entire body and scarce body of law that deals with official immunity is just what you said, Judge Pillard, officials. That is, the vast majority of these cases involve someone who has an employment relationship and even an sometimes just employees, but within the formal structure of the government. And so much, Mr. Coffin, I'm sorry to interrupt, but you know, so much is done by governments around the world through contract that used to be done by employees. And I guess my precise question is, we don't have a State Department statement of interest here. We don't have coming in and asking for a position, but if we were to say, I mean, is the best way to resolve this case to rely on the burden? There hasn't been a showing that there's an established State Department position, but if the State Department wanted to develop one, nothing that we say would foreclose that. That's right. That's right. On the agency point. Right. Right. I think it would be an irrigation of judicial power with all due respect to my friends on the bench to try to fill a gap here, a common law. So my favorite quote in all of this case, Judge Randolph, you're not going to be surprised, is your statement in your separate opinion in Lewis, where you say it may be that there is and never has been a common law for an official immunity. I think that's right here in two respects. First, the respect that you said, which is there's just not that much law. There's just not enough of a body of law for us to look at and decide what, you know, what the standards are. But second, and this is really critical, there is no common law in the classic sense of common law, judge made gap filling. What the entire focus of this inquiry is, is what would states say? What is the State Department? What is the position of the United States? And Hoffman, going back to 1949, Hoffman says, courts shouldn't be making it up one way or the other. It's just as bad for a court to try to fill a gap where states wouldn't provide immunity as to do the opposite. And so- So when you refer to common law, you mean State Department common law. That's what common law is in this limited context. The substantive law that Hoffman says applies here is what would state do, right? And what you're looking for is an established policy. Now, as to agency, there simply aren't established policies that extend immunity to contracting agents. And what I would say is, if you look, go back to Underhill, the Second Circuit's opinion that led to the act of state doctrine in the late 1800s, what that court talked about was immunity for the official representatives of the state. What other courts have talked about are acknowledged and embraced agents, are the authorized and ratified acts of those agents. Going back as far as the first statement by the executive branch, the Attorney General 1794 opinion in Suits Against Foreigners, which is one op Attorney General 45. This is the Guadalupe governor case. If the seizure of a vessel by the governor in that case is admitted by the foreign state to be an official act, well, then immunity might apply. What we're talking about in all of these cases, to the extent agency matters, is avowed agents. That is, the foreign state says, these are our actions, which is exactly what happened in the Southern District of New York case, the Moriah case. Israel came in and said, this guy who was our former official is still kind of acting, doing black ops for us on the side. They put in an affidavit to that effect. These are avowed agents. That's point one. I don't have to win on that point to win this case, though. Because even if you assume agency, what the United States said in USEF is that residency matters. That is, even if you assume a foreign official who was acting within the scope of their official, in their official capacity, because a foreign official in USEF v. Samantar had moved to the United States and was resident in the United States at the time of the suit, the United States said a major principle in not extending immunity to that foreign official is that they are a resident of the United States. And that's kind of essentially reciprocity. They're subject to our law. They benefit from our law. It's a principle of US sovereignty, right? That's what the United States said is, we recognize as an international law principle in USEF that the immunity of the official exists for the benefit of the state. We recognize that. Nonetheless, and that's the key word in the USEF statement of amicus. Nonetheless, where there is a binding tie to the United States for the particular defendant, that is where they're a resident, the United States says there's no immunity. Now, Mr. Obermeier says, yeah, but there was no established government there. And that was the other principle on which the non-immunity determination rested in that case. Well, if you look at the subsequent history of that case, as we lay out in our brief, when there was a recognized government and the United States met with that government, and that government said, we're not going to assert immunity, the US said, well, matters. We still stand by our original non-immunity determination. And so this case really is on all fours. That is, while there wasn't, it's not a case of a government that doesn't exist, but we have a government that's standing on the sidelines. A government who hasn't gone to the state department, hasn't asked for immunity. And we have US residents who are claiming immunity on their behalf. That principle alone, we win on. So Mr. Coffin, I do want your help just circling back in light of your argument to the appellate jurisdiction question. On the one hand, just because, or if a court's going to find that there is no immunity, that is separate from, that doesn't defeat jurisdiction. I mean, we know that from ARBA and a whole line of- And I'll take that. I'll take that judge. I understand, but we're trying to get it right. I mean, that's our job. And so in some sense, it seems like the first case presenting a particular kind of fact scenario, like a non-official, non-employee, non-avowed or claimed private contractor, it seems like, well, there's an immunity issue bound up in there because there's an immunity claim. And then it seems like after, if we were to so hold, then it would become clear, there is no immunity there, therefore no leg up to the court of appeals for purposes of a collateral order appeal. But that seems like that can't be right, that the question, the first impression aspect of the question can't be the ticket to the court of appeals, uh, that then is used up. Well, I guess, look, I guess the question is, how come, I mean, there's a separate question that Judge Katz has asked in the, uh, API case, you know, is how colorable is the claim? Now, you get to- The PSIT, you're talking about Nigeria case? Yeah, the Nigeria case. Yeah. Last year's, last year's case. A-P-N-I, I believe. Um, attorney, something process, B-U-N-I. Yeah, B-S-I-D, Process Industrial Development Corporation. There you go. Thank you. Yeah. Um, he, there's a separate inquiry of colorability. Um, we don't, we actually don't think these are colorable claims given the lack of Cutter's involvement here. Um, uh, and that's, that's, I mean, that, that layers on top of, uh, the collateral order analysis. And we think we could win on that. Um, but, but, you know, if you say, well, it's, you know, it's debatable, it's colorable. Um, uh, we, you know, we, we still think that the nature of an assertion, the nature of an assertion by a mere agent of a foreign sovereign who has no contract, no, nothing but a contractual relationship, uh, with, with the foreign country just doesn't rise to a level of, of a substantial public interest, uh, which I, which I, I see not your favorite argument, but that's our position. And again, They do have obligations of direction by Cutter, but. Oh, no, Your Honor, let me speak to that for a second. We, we have not alleged what we have alleged is that, and this is, I think we've alleged very clearly, we have alleged that Mr. Mr. Muzzin, Mr. Muzzin identified Elliot Broidy as a problem that needed to be dealt with. These defendants were deciding which packets of information went to which newspapers. That's our allegation. The, the, the, the direction we have not alleged direction by Cutter. We've alleged that this stuff has been done on behalf of, and in complicity with Cutter, but we've alleged that these guys have had an enormous amount of discretion into how to carry out this plan. You know, go after Elliot Broidy, if that's a direction, okay, maybe, but even there, it was Mr. Muzzin that said we have to go after Elliot Broidy. So factually speaking, I don't, I don't buy into the notion that our, that our complaint alleged direction. Yes, it, it did allege that these guys were ferry agents. It alleged that they acted, you know, in complicity. Excuse me. Excuse me. Yeah. I want your comment and I'll ask Mr. Obermeyer the same question to this statement as a general rule that is for non-official, non-foreign government officials claiming to be agents of the foreign government that a necessary, although not necessarily conclusive requirement for any assertion of immunity is that the foreign government communicates to the state department that it's invoking on behalf of these individuals, its immunity. Your honor. I mean, that, that's, that's a predicate to our position. I mean, I think that's absolutely correct. Absent Cutter, absent Cutter's avowal, absent Cutter's ownership of, of these acts. I mean, yes, they were ferry agents. And the reason, the reason I formulated that way is that one of the things that we're trying to do, and this argument back and forth really reflects it, is to see what impact either giving immunity or not giving immunity would have on the foreign relations of the United States with the country at issue. And you really can't know that. I mean, we're just guessing and we're trying to make up some rule of law that weeds out the cases that don't have an impact from the cases that do. But the easiest way to do that is just make it a prerequisite that the foreign government has to communicate to the state department on behalf of the individuals. And if the government doesn't, they don't get immunity. So when, when, Your Honor, when there is, I, I agree with that. What state has said is when there are officials, okay, when there's someone who's the president or defense minister, state will apply a presumption that their, that their acts are official, and then they'll try to confirm it. But you can't do that. Exactly. That's why I framed up in terms of non-official foreign officials. We're talking not about... That's the key distinction between officials and agents here is you can't do that absent a vowel by the, by the foreign government. My only hesitation, I'd like your response to what if Mr. Obermeier's clients had a contract that said in terms, you know, we believe that in this activity, you're acting as our agents, including for purposes of any immunity that might be claimed. And, you know, I mean, for example, then the government changes and doesn't want to disavow what the prior government did, would seem like there would still at least be a question whether they were carrying material with, with employees of a former regime that were treated presumptively as acting on the state's behalf. And of course, you know, this is a counterfactual hypothetical, because you yourself have said that the agreement said just the opposite, but you're suggesting, well, there might be some objective evidence outside the state. But I think for, I think for the reason Judge Randolph is suggesting, there's no, you just can't know what the foreign affairs implication is when the state isn't stepping up. But, but again, under either standard, whether it's you have to go to state, or you have to look for objective evidence outside, you know, get there here. You, the, there is no avowal, these are, these are black ops, right? I mean, what state is going to come into a court and said, Yes, these guys were our hackers. And they were, you know, they were doing all of this on our behalf, they want plausible deniability. But there's a price to that. And, and the United States judge understands that. I mean, one thing issue with the Ninth Circuit honor, one of the many things I take issue with the Ninth Circuit on, despite the fact that, you know, two of the judges were my colleagues in the Justice Department. But despite that, the thing that I would that I would take issue with Judge Collins on in the Ninth Circuit, is the notion that, that, you know, that there's going to be some major international implications to, to holding, you know, holding Cutter responsible. Certainly, let's put Cutter out of the picture. But as to the agents, you know, absent avowal, there's just, the state continues to maintain plausible deniability. And as to these covert operations, every state, including the United States, understands that if their operatives are caught in a foreign state, those operatives are basically on their own. I mean, the CIA does what it can behind the scenes to bring them, you know, to get them back. But, but the United States operates at its own risk in covert operations overseas. Right. And so, so the reciprocity is not, it's just not as compelling here. Judge Walker, do you have any other questions? Judge Randolph? None for me. All right. Thank you, Mr. Coffin. We've done way over time, and Mr. Overmyer will give you a couple of extra minutes. Thank you, Your Honor. I will be brief. First of all, I wanted to make clear something that I said earlier with respect to agents in response to a question of Judge Walker, and it's related to something that Mr. Coffin said. The complaint alleges that they are FARA agents, and the complaint also alleges that they had lawful contracts where they were doing lawful activities, and then it turned into something, whatever he says, I think is more sinister or something like that. So, I just want to be clear, like with respect to FARA, we're talking about the conduct that was, the contract that was registered and going forward, so I want to be clear about that. That doesn't change anything, though, with respect to- So, let me ask about that, because I thought that your answer was clear when you gave it, but then I thought you maybe backed off of it a little bit later in response to some other questions. So, maybe I can think of a more precise way to ask the question. With regard to the context of this case, are each of the four defendants, are you representing that each of the four defendants are agents of Qatar? I guess the answer, Your Honor, I don't mean to be obvious, is it depends as to what. I mean, with respect to what was registered under FARA and the lobbying work they were doing, they were agents of Qatar. What has been alleged is that they were also agents in a hacking conspiracy, and that allegation of direction, and I can talk about Mr. Coffin's direction comment, that is distinct, but it still gets you to the same place. I think the complaint alleges that at least some of the defendants were not registered under FARA for the entire time. Do you represent that for the entire time in question, each of the defendants were agents of Qatar? Your Honor, I don't remember the specific timing of the FARA registrations for all of the powers, but I agree with you. The complaint mentioned something about that. I just I don't know the specific dates. I mean, regardless of whether anyone was registered under FARA or not, maybe I'll give this one more shot. Do you represent that each of the defendants were agents of Qatar? For purposes of the lawful actions they took, they are alleged to have been agents of Qatar to participate in a conspiracy to hack and back to what's alleged in the complaint, with regard to the time period in question, with regard to the time period that's covered by the complaint, and without regard to whether they were registered under FARA or not, do you represent that each of the defendants was an agent of Qatar? Yes, but what I'm trying to say, Your Honor, is just that I'm not, I just wanted to be clear that I'm not saying that we agree with the allegations that they were agents. That's all I'm trying to get. I apologize for being obtuse or too talkative I'm not asking you to admit that they did everything that's in the complaint, but I do think that it's hard for you to assert foreign sovereign immunity without representing it as a necessary but not sufficient argument that, with regard to the time period in question, each of the defendants were agents of Qatar. I don't disagree with you, Your Honor. FARA sort of adds complications, and then I wanted to make sure, up to your point, I was clear about what I was saying on behalf of my clients. That's all, but I don't disagree with what you said, Your Honor, on that point at all. Okay, thank you. The next thing I want to do, well... I think we're over time, unless one of my colleagues has a question. Well, I'd just like Mr. Overmyer's comment on the statement of a legal principle that I asked Mr. Coffin about. Well, Your Honor, I'm sure you won't be surprised that I disagree with the principle, and I disagree with it because, you know, what Samantar says, the Supreme Court has said that, you know, the statement of immunity is not the sine qua non of foreign sovereign immunity. Under the FISA, that's true, and as far as federal or foreign officials, that may be true, but we're not talking about either one of those categories of people. We're talking about people who are even more remote, in other words, contractual agents. But, Your Honor, that's why I disagree with you respectfully, because the established policy, the common law, is that it's not the status, it's not them as officials, it's that agents of the foreign sovereign are entitled for immunity for actions directed by the foreign sovereign. That goes back, I think Mr. Twygros, a UK decision that has been cited favorably by the State Department. What about Mr. Coffin's point that these aren't actions directed by the sovereign, even on the allegations of the complaint alone, which says you hired these people, or you hired these, Qatar hired these people, and they decided in their discretion how to carry out the general remit, and this precise means and the precise targeting was not the directive of Qatar? Two things, Your Honor. First of all, I already read this, but this is from page nine of their opposition interlocutory appeal, where Brody says that he, quote, alleges that defendants acted at Qatar's direction, end quote. Generally. He doesn't deny that, generally acted at Qatar's direction. But what's key for derivative immunity is that what he has alleged they were directed to do is what is the basis for the alleged liability. He alleges that he directed them to disseminate materials. All right, do some great press for me, I hope you find dirt, discredit this guy, see you later. And if I did that to my intern, I'm a newspaper editor, I do this to my intern, go find someone, and the intern goes and commits criminal activity, surely- I don't disagree. I mean, that's a bad example, because it's not a government or immunity example, but chief of police says to officer, go do X and so, there's no defense of following orders there. I don't think I disagree with anything you're saying, Your Honor, but what I'm saying here is that what's alleged to have been directed is the conduct that establishes liability. So in Butters, the conduct was don't hire the woman because she's a woman. Right. Name was Title VII. That's the level of specificity. Right. Here, the specificity is disseminate hacked materials, that he decides to do it to the Wall Street Journal and not the Washington Post or whatever it is he alleges happened. That's besides the point, because what forms the basis of liability is the direction to conspire to hack and disseminate. Other questions? No. Thank you very much, counsel. That was well and informatively argued. The case is submitted.
judges: Pillard, Walker, Randolph